Good morning, may it please the Court, Nathaniel Love for Plaintiff Appellant FICO. I'd like to reserve three minutes for rebuttal. I'll begin with the District Court's new trial ruling and then move to the other issues. The jury in this case heard evidence that Chubb used FICO's copyrighted Blaze software for years to run a multi-billion dollar business. The jury found Chubb liable and it awarded $40 million in damages supported by the extent of Chubb's use of the copyrighted software to issue policies that led to billions of dollars in premiums. Now the District Court in this case threw out that jury verdict based on a legal error. It discarded and deemed inadmissible proper hypothetical negotiation evidence, principally the testimony of I think throw out is a bit of an exaggeration for a remitted order. Well, Your Honor, with respect to the new trial order, the judge's position was that all the testimony Mr. Wade offered, the evidence of Chubb's use, which is principally in Exhibits 5 That's a second trial issue. When you say throw out, I don't agree with that. So the District Court's new trial order, it took the position that Mr. Wade's testimony about FICO's licensing practices, his testimony about the documentary evidence of those licensing practices should not have been considered by the jury. Can you relate it to the issues presented for review and now you've jumped from the remitted order to the new trial order? At this point, Your Honor, I'm I'm not sure you are. I mean, I know you've presented both issues. Take them one at a time. I intended to, Your Honor. I'm beginning, intended to begin with the new trial order and not discussing remitted order. The judge's, the District Court's position as to the reasonable royalty evidence was that essentially everything except these historic license agreements was discarded. He rejected the evidence of the change in FICO's licensing practices. He rejected the testimony that explained how FICO's global price list and FICO's application sizing pricing applied to Chubb's use. All of that was not speculation. It was documented evidence of FICO's licensing practices. It was evidence of Chubb's use, the number of applications that Chubb used when it was infringing. Why was it incorrect for the District Court to emphasize the importance of having objective evidence versus subjective? Sure. So the objective-subjective distinction is one that I think there's some potential for confusion on. What's clear under the jury instruction, which is at Appendix 65, that the hypothetical negotiation is to consider, among other things, the expectations of the parties coming into that negotiation. The District Court was not paying attention to its own jury instruction when it discarded this evidence because Wade's testimony was about FICO's expectations going into the hypothetical negotiation. Essentially, subjective evidence in the law would be something like, hurt feelings, you know, I don't want to issue a license to this infringer because I'm angry at them. That would not be a legitimate consideration for the hypothetical negotiation. But what the reasonable royalty cases absolutely support is established licensing practices of the rights holder are a relevant consideration, and the District Court's own jury instruction said that the expectations of the licensor would be a relevant consideration. Now that's not to say that those are dispositive. Certainly the jury was not supposed to simply accept one side's position. It's something that the jury could properly weigh, and the jury in this case heard positions from both sides as to how the parties would have approached it. And the jury was well within its rights to give more weight and find Mr. Wade's testimony more credible and find Shub's positions not credible. What the District Court essentially said is evidence of FICO's expectations must be discarded and cut away, and it did that in its post-trial. Didn't it base it in terms of the speculative nature of characterization of that evidence? It attempted to characterize it as speculative, Your Honor, but what it was was not speculative. Wade was speaking from his personal experience as a business person at FICO actually responsible for these negotiations. And he didn't simply offer testimony grounded in nothing. He went through the Global Price List, which is essentially a licensing manual for FICO. FICO is a software company, so the way it makes money is by licensing its software to others. So this is not, you know, something like the case, many of the cases that Shub is relying on where it's a work that has barely been licensed before, a work of art that maybe has never been licensed. FICO has licensing business practices, documentary evidence of how those work was before the jury, and Wade's testimony walked through those and explained how, for example, the use in 15 applications to run millions of transactions using Blaze, that was Shub's use. How did that apply to FICO's established licensing practices? So it's not speculation. It's testimony based on personal experience. It's grounded in documentary evidence of FICO's practices and of Shub's actual use during the time of the hypothetical negotiation. Now, what's our standard review for this speculative notion or your response to it? So the question that the district court... This is a hugely uphill struggle for you. I mean, our standard review is so deferential and new trials are so disfavored. So what the district court ought to have been doing is assessing whether... That's your opinion. Well, the standard... Even if it's ours, can we substitute our opinion? The standard of review that the district court ought to have been applying in the new trial order was whether there had been a miscarriage of justice. That is not what he did. What he did was to say, as a legal matter, this evidence ought to be excluded. And this court has been clear that a legal error like that is an abuse of discretion. So this is not a question as to whether his weighing of the evidence was inappropriate. This isn't a decision that turns on the weighing of the evidence. He said this evidence is out and only these old, outdated licenses that were entered into years previously when FICO was aggressively discounting and attempting to get market share, he treated those as dispositive. And Wade's testimony, which put those historic licenses in context and explained why they did not reflect what would happen in 2016, he discarded all of that. None of that is supported by the case law that describes how reasonable royalty damages are to be computed. So just to walk through exactly what Wade offered, Wade testified from the global price list, which is in Appendix 936. That's the pricing manual FICO used. He explained two different models that may have applied in 2016, an enterprise-based license, which would have led to approximately $30 million, and an application-based license, which would have led to approximately $50 million. He used Chubb's evidence of what Chubb's use of the software was to explain how those licensing structures would apply. None of this was speculation. He was not guessing. He was not speaking from thin air. It was grounded in FICO's policies, and it was grounded in the use that Chubb made. And the use that Chubb made, there's reference in the briefing that it's back-office software, that it somehow just speeds things up in some nebulous way. That's not what the record reflects. Blaze is decision-making software. It enables a company like Chubb to automate decisions that drive its insurance business. And the decisions I'm specifically talking about and are reflected in the record in Exhibit 518 are determining eligibility for a policy. Blaze does that automatically. Setting a price for a policy, Blaze does that automatically. Counsel, how do you respond to the district court's conclusion that the evidence about Blaze could not be connected to this? I know it gets to the discouragement question, but you couldn't connect what Blaze did for the customer to the customer's profits. So right, and I think that evidence, the answer to that goes both to supporting the original verdict but also to the discouragement question. So what's shown in Appendix 646, which is this Exhibit 518 that I'm talking about, is the specific list of applications and what they do in Chubb's system. And so you'll see when you look at that exhibit that certain of the applications were used to set prices. When a customer agreed to buy an insurance policy from Chubb at a particular price, it had been deemed eligible by rules running in Blaze. The price had been set by rules running in Blaze. And so there's an acceptance by a customer of this insurance policy because of the decisions that Blaze made. It's not some distant attenuated thing. It is concretely and directly tied to the set price of the policy that a customer agrees to pay for. And there's also a reference you'll see in that exhibit to automated renewals. Blaze made decisions to trigger automated renewals of policies. And so premiums continued to float at Chubb because of the actions that were taken in Blaze to automate those renewals. That is a very direct connection between this reduced set of $21 billion in profits and the use of Blaze. So that kind of usage certainly supports the jury's verdict, which is, you know, certainly well south of anything in the billions. It's $40 million. But also with respect to disgorgement, that is evidence that demonstrates we went far beyond simply showing some connection between the use of Blaze. We showed how Blaze was directly used to set the prices that customers paid for these policies. And the burden on disgorgement ought to have shifted to Chubb at that point if it wanted to present evidence to separate that out from the other elements of its business. And the district court in adopting the jury's verdict on that disgorgement issue clearly applied a burden to FICO that ought to have been applied to Chubb. The evidence where that is most clear is at Appendix 130. The district court wrote, Blaze was one part of computer applications helping defendants sell insurance policies that says nothing of the specific contribution to sales made by Blaze. He held that against us. You're in the middle of the details of the briefing, and I start out with a much more basic level of ignorance, and that is your whole section, leading section, is the hypothetical negotiation construct governs actual damages for copyright infringement, and you go on for five pages and I do not see a controlling case cited, controlling on us. Now, this all leads to a 15-factor test, and I have to tell you, I don't apply 15-factor tests unless the Supreme Court tells me I have to. I understand, Your Honor, and it's certainly not our position that applying a 15-factor test from Georgia-Pacific is necessary to resolve this case. It was agreed by the parties. What was it? Wait a minute. Okay. Go ahead. Agreed by the parties, that's what I'm getting at. If that's true. It is true, Your Honor. The hypothetical negotiation construct that's reflected in the jury instructions was agreed to by the parties. That that... When and how? In the... Before the district court, in coming up with the jury instructions for actual damages. That's an agreed and unobjected to jury... But in that case, I understand for disgorgement, but disgorgement and actual damages are not the same for me. Actual damages can be measured in all different kinds of ways. I understand that, Your Honor. I'm speaking specifically about the actual damages instruction. There were separate instructions for each of these components. The one on actual damages is an agreed construction, agreed instruction on reasonable royalties. And it's one that is not challenged on appeal. You'll find it at Appendix 65. It's an agreed instruction that says it's a hypothetical negotiation between willing parties informed by their expectations. I'm into my rebuttal time. I want to briefly touch on remittitor. If the court is disinclined to reinstate the jury verdict, remittitor is required. Maintenance and support is a necessary part of every license in the record. Development seats are integral to any license to Blaze Advisor. The district court refused to include those amounts. The maximum recovery rule requires their inclusion. And any remand would need to include those. And I'll reserve the rest of my time. Thank you. Mr. Metlitsky? Yes, Your Honor. Thank you. Anton Metlitsky for Federal and Ace. And I'll refer to them collectively as Chubb. Excuse me. May it please the Court. Just a few, I'll start out on actual damages and just a few things in response to my friend's argument. First of all, we did agree on the hypothetical negotiation standard in the jury instruction. We did not agree to any 15-part test. It is not true that the district court ordered a new trial only because he thought Mr. Wade's testimony should be excluded under Rule 403. He also said, this is addendum to their brief 124, even if Wade's pricing calculations were properly admitted, defendants are nonetheless entitled to a new trial on damages because the verdict was excessive given the facts and the law. That is subject to extreme deference under this Court's precedent. And the reason the district court not only did not abuse its discretion, but was absolutely right to order a new trial, is that Mr. Wade did provide testimony about what he would have ---- I'm still on the law. What case says that you can agree to the hypothetical negotiation construct and not agree to the 15-part test, which apparently so many courts are debating? So the 15-part test is from a 55-year-old district court patent case. There is no ---- there is a bunch of law ---- You didn't listen to my question, which so many courts seem to, according to the brief, I haven't read all these cases, but apparently this is where the courts go when they use ---- No. Right. No, that's not true. So ---- What court, what circuit court opinion is best for your view of this issue? So the main opinions are ---- I mean, first of all, the 15-part test is not going to get them anywhere anyway, but it's not applied in copyright cases generally. The main ones are Davis, the Davis case from the Second Circuit, doesn't cite any 15-part test. Gaylord case from the Federal Circuit, which also doesn't ---- you would think if, you know, any court was going to cite the patent test, the Gaylord case would. But what they said is, to calculate the fair market value, a court deciding copyright case may use a tool familiar from patent law without necessarily following every aspect of patent law's use of that tool. And they didn't cite any of those 15 factors. There's the Jarvis case from the Ninth Circuit that talks about objective considerations. There's the Oracle case, which is directly on point here, which says that you don't look at ---- you look not at what the owner would have charged, but rather what the fair market value is. It doesn't cite Georgia-Pacific, but that is the main point here. Mr. Wade did testify about what he would have charged in his experience. But as the Oracle case points out, if all you have is something like that, a price list or testimony about what a buyer would have charged, without benchmark licenses, you're relying on speculation. And here, FICO obviously had access to every single license that they have ever sold for Blaze. So Mr. Wade says, you know, I would have asked for $37 million. The jury for some reason thought that he should be bid up by $3 million. If he had anything like that, if that were right, if that was something that a willing buyer would agree to and not just what a seller would like to charge, he would have had a license for something like $37 million for a similar company. But in fact, Blaze had never been sold to any company of any size for more than $3.8 million. That is an order of magnitude difference. Moreover, it was undisputed that there are competitors in the market that do the same thing. I understand that as in support of the remitted order, right? I don't understand why you leap to excluding the testimony from the point you just made. So the district courts, as I read it at the outset from Addendum 124, the district court's decision does say that he would have excluded, he should have excluded the testimony under 403, but it then goes on to say that even if you don't exclude the testimony, this is, as you said, even if Wahl's pricing calculations, Wade's pricing calculations were properly admitted, defendants are nonetheless entitled to a new trial on damages because the verdict was excessive given the facts and the law. Mr. Wade testified about what he would have charged, but the benchmark, again, FICO had never been sold for more than $3.8 million. That's an order of magnitude difference. We, unique to this case, we have an email. Had it been sold for use on the level that was being sold?  Yes. It was usually sold for use enterprise-wide for any application, right? Then what's more, unique to this case, we have an email from one month before the termination of the license agreement, which is the relevant time for fair market value, saying, we're going to charge, we're going to charge FICO. We're going to ask for $3-plus million for a license that would have covered this infringing use. Three, that's, again, an order of magnitude difference. You would think that what they were going to offer would be the ceiling for the hypothetical negotiation, but there's no chance, there's no way you can get from an offer of 3.5, or excuse me, $3-plus million to $40 million. And finally, it's undisputed that there were other products in the market that did the same thing as Blades. FICO bought one of them, a four-year license, which is exactly the length of the infringing use here. It cost $1.5 million. So when Mr. Wade says, I would have asked for 37, no willing buyer in their right mind would pay 37 when they could pay 1.5 for a substitute. That was a … Why is that a basis to exclude? So there are two different things here. It is, most importantly, a basis to grant a new trial based on the weight of the evidence. It's also a basis to exclude under … No, the error on appeal is the exclusion of the second trial. Your Honor, it's not. The error they're raising is the grant of a new trial, and as I said, the grant of a new trial had two alternative bases. One was a Rule 403 exclusion, which we agree with. Rule 403 is well within the discretion of the district court, and the district court found that this testimony, because it wasn't tied to any objective evidence, had the effect of misleading the juror. But also, the district court found that even if the evidence was properly admitted, it would not have supported this jury award because the evidence by itself does not suffice to establish a nonspeculative damages amount without benchmarks for similar licenses for competitors, and the actual benchmarks and the actual price of a competing license are undisputed, so is the price that they themselves admitted that they were going to charge one month before the license was terminated, and all those are between $1.5 and $3.8 million. And the district court said, wait, you can't go an order of magnitude higher than what all the benchmarks say, especially when the benchmarks include the price for competing products for the same use and what they would have charged. They admitted in an e-mail and in deposition testimony they were planning to charge one month before the infringement. So, again, this is an abuse of discretion standard, broad discretion, great deference is what this Court has said is given to these kinds of decisions, but we think the decision was right even without the deference. Now... Do you turn just briefly to the remitter and defend the exclusion of the maintenance fees and the maintenance and support fees and development components? Sure. So are the development components. So the development components was just a failure of proof. So their witness testified that development, this is, I'm quoting from 1641 of the transcript, development licenses are licenses that are granted and limited to the purpose of writing rules, connecting your Blaze Advisor application to your systems and data, and actually generating the deployment that gets eventually put into the servers of the client. That's what the development license is for. And they did not offer any evidence that FICO did any of that. And so because the actual damages is the fair market value of a license for the infringing use, they didn't use development, the district court found that there was just no evidence to support that part of the remitter. And the way you know that there's no evidence is because the evidence that they cited in their reply brief at page 28 is testimony from the second trial. Right? There was no, they didn't offer any evidence like that in the first trial. As to maintenance and support, the reason that is not excluded is because maintenance and support is not part of the license and thus doesn't implicate the infringing use. It is a separate fee for a service that FICO did not provide because they terminated the agreement. Right? So they're looking for a windfall. They want the revenues that they would have gotten for maintenance and support, but they didn't provide that service. Right? The, if they had wanted to, and so, so a few points there. So you're saying those aren't, those weren't actual damages suffered then? Is that the argument? Or? There aren't, they aren't actual copyright damages suffered because the copyright damages that we're talking about are a fair market value for a license for the infringing use. So they're trying to get revenue, not even profits, for maintenance and support, which is a fee for a service that was not for the use of the, of the software, but for a separate service. The way you can, you can work through that in the agreement itself, which starts at Appendix 528, is Section 2 and 3 of the, of the agreement are about the license grant. You pay a fee. You pay the license fee. And then it says that you have a limited license to use Blaze during the term. Then Section 4 is a separate provision called services. That's on Appendix 530. And one of the services provided is maintenance and support. And it says in exchange for a maintenance and support fee, you go take a look at Exhibit B of the, of the agreement, which is like a separate five-page agreement that tells you all the things that FICO is supposed to do in exchange for that fee. They didn't do any of those things because they terminated the agreement. Now, they could have gone about this a different way. They could have done this all under contract. Rather than terminating the agreement, they could have continued to perform and sued for expectation damages. They could have said, you know, the license should have been higher because you breached. Maybe we would have gotten more profit in maintenance. But in New York, I assume everywhere else, there's a doctrine called election of remedies. You can either terminate a contract and then not have to perform anymore, but then you don't get the benefit of what you would have gotten going forward, or you can sue for breach, right? And then seek to get the benefit of what you should be getting going forward. They decided to terminate, which means that they aren't entitled to, even under contract law, to future maintenance fees because they decided not to perform and provide the maintenance. The consequence of that for copyright is that there was no longer any license, and so Chubb's continued use put them into infringement, right? So now they were operating without a license for use of the software. And so FICO suffered actual damages in the amount of the fair market value of a license for that use. But it has nothing to do with maintenance and support. Another way of thinking about it is actual damages are what the infringer took. They're supposed to compensate for what the infringer took from the copyright holder. Well, what FICO took, excuse me, Chubb took is using the software. They didn't take maintenance and support because FICO never provided the maintenance and support. So that's the answer on that one. The last point here, if the Court would like to hear about disgorgement. So I think, first of all, there is a jury verdict here, and the jury was absolutely properly instructed. They object to the term causal nexus. But from this Court's decision in Andreas, Andreas describes the burden as a nexus, as causal connection, and it adopts the Mackey case from the Ninth Circuit, which calls the burden a causal link. So the jury instruction cannot possibly be wrong. The jury found zero nexus. The district court applying Andreas, likewise, based on findings of fact that are reviewed only for clear error, found that while Chubb may have, sorry, Blaze may have benefits, they didn't prove that Chubb actually got those benefits, and even if they did, any connection to revenue is speculative. That is not surprising. In a case like Andreas, where you have the infringing use in the context of a commercial that is consumer-facing, you might be able to show that because consumers saw this ad, liked this ad, and the infringing use was the centerpiece of the ad, that that affected consumers' buying decisions. But the further you get away from the consumer, the harder it is ever going to be to prove that there is a sufficient nexus to revenue to establish indirect profits. And just a few cases that I would cite the Court, the polar bear products case from the Ninth Circuit that we cite in our brief, discussed Andreas. And it said that case was unlike Andreas because in contrast to Andreas, no evidence established that the infringer may have actually influenced the purchasing decisions of those that bought the relevant product. In this case, it's undisputed that no customer had ever heard of Blaze. There's no way Blaze actually affected the purchasing decisions of the customer. I would also point the Court to a footnote in that case, footnote 7, which says that it's particularly important for the plaintiff in indirect profit actions to demonstrate the causal link because the infringement and the profit sought are so diffuse. And finally, we cite the Patriot Treatise on Copyright, which says that these kinds of cases, these kinds of damages in indirect profits case should be extremely rare. So, again, it's not surprising that both the jury and the district court found that they didn't satisfy the standard. And the last thing I would say is the other reason it's not surprising is that they put up an expert, Mr. Whitener, who was supposed to establish this connection, but he not only conceded that he couldn't, but the district court for seven pages in its opinion explained why that expert wasn't credible. Those are pages 132 to 139 of the appendix. So when the expert that they put up to establish this exact thing is found non-credible by the fact finder, by the judge, and presumably by the jury, that is reason enough to conclude that the nexus that he was meant to establish was not established. Thank you, Your Honors. Thank you. For Rameau. Thank you. On the hypothetical negotiation and the applicable law, I encourage the court to look closely at the Gaylord case from the Federal Circuit. That is Chubb's lead case. They state it throughout their brief. That's their number one authority on the hypothetical negotiation. It extensively cites the Federal Circuit's body of law. What's that case again? Gaylord. It cites Laser Dynamics, Vernetics, Erickson. These are all Federal Circuit cases about the hypothetical negotiation. They are exactly the case the court should look at. As to whether or not benchmark licenses are required, what is clear in Gaylord and all of these cases is prior licenses may be informative if they are comparable. These licenses are not comparable. We provided extensive testimony as to why they're not comparable. Their argument is basically, well, even if we infringed on a scale that no other licensee had ever used this product, we get the benefit of the lowest license you ever entered into, or the highest license you ever entered into, and nothing actually tracks the scale of use. The jury awarded damages based on their scale of use. I want to touch on the remitted arguments. There's no failure of proof on development seats. We had testimony in the first trial that Chubb asked for these development seats, that it needed to use these development seats, they ought to have been included. Maintenance and support is part of every license, and the district court actually made that finding twice. If you look at Addendum 94 and Addendum 129, you'll see that the district court recognized and acknowledged that every license had maintenance and support included. Their argument, as we said in the brief, is like someone who steals a car and then says, well, I never used the warranty, so I shouldn't have to be accountable for the price of the car that included the warranty. On disgorgement, this is a legal error. This is not weighing the facts. Appendix 68 is the jury instruction which put Chubb's burden on us. The district court also articulates the wrong legal standard most clearly at Appendix 130. Finally, on the consumer point, as I said, Blaze set prices that consumers actually paid. Blaze determined eligibility for customers. When customers bought the premiums, they did so because Blaze set the prices. Thank you. Very good.